623 F.2d 791
 Fed. Sec. L. Rep. P 97,525
Lawrence OLECK and Theodore Oleck, Plaintiffs-Appellants,
v.
Alan H. FISCHER, Robert D. Esskes, John W. Thomas, Hyman
Kauff, Federated Answering Services, Inc., and
Arthur Andersen & Co., Defendants,
Arthur Andersen & Co., Defendant-Appellee.
 No. 496, Docket 79-7513.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 7, 1980.
Decided June 4, 1980.
 
 1
 Edward Labaton, New York City (Kass, Goodkind, Wechsler & Labaton, New York City, of counsel), for plaintiffs-appellants.
 
 
 2
 James D. Zirin, New York City (Breed, Abbott & Morgan, New York City, and Wilson & McIlvaine, Chicago, Ill., of counsel), for defendant-appellee.
 
 
 3
 Before MANSFIELD and WATERMAN, Circuit Judges, and LEVAL, District Judge.*
 
 LEVAL, District Judge:
 
 4
 Plaintiffs Lawrence and Theodore Oleck appeal from a judgment in favor of the defendant Arthur Andersen & Co. ("Andersen") following a bench trial before Judge Haight.
 
 
 5
 In March 1971, the plaintiffs sold their stock in Blue Circle Telephone Answering Service, Inc. ("Blue Circle") to Sherwood Diversified Services, Inc. ("Sherwood") in exchange for cash and promissory notes of Sherwood. In negotiating and concluding the transaction, plaintiffs were furnished with and relied on the 1970 financial statements of Sherwood which had been audited and certified by Andersen. Before the notes were paid in full, Sherwood, became insolvent and sought protection of the bankruptcy court. The plaintiffs brought this action pursuant to §§ 10(b) and 27 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78aa (1978) and Rule 10b-5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5 (1978), against various former officers and stockholders of Sherwood, and against Andersen. The plaintiffs settled their claims against all of the defendants except Andersen.
 
 
 6
 At issue in the litigation is the accounting treatment in Sherwood's 1970 annual report of Sherwood's purchase and rapid divestiture of a business here referred to as U.S. Media, consisting of the assets of the U.S. Media International Corporation. Plaintiffs contend that Sherwood's accounting presentation of this series of transactions was fraudulently misleading and that Andersen was liable to plaintiffs for this fraud as an aider and abettor by reason of its complicity in the preparation of the financial statements, its inadequate reserve established against loss, and its allegedly unjustified issuance of a clean certification.
 
 
 7
 The transactions are here described in somewhat simplified form, since the precise details are unnecessary to this ruling. The facts are set forth in full in Judge Haight's craftsmanly opinion below Oleck v. Fischer (1979 Transfer Binder) Fed.Sec.L.Rep. (CCH) P 96,898 (S.D.N.Y.1979) (hereinafter cited without cross-reference as "Op. below").
 
 
 8
 By a purchase agreement dated January 16, 1970, Sherwood acquired the U.S. Media business. As consideration, Sherwood paid to the selling corporation $2,000,000 in cash, a promissory note for $750,000 and over 300,000 shares of Sherwood common stock.
 
 
 9
 By May 1970 Sherwood perceived that the acquired business was not performing as well as had been anticipated. Sherwood was therefore required to advance $1 million to its U.S. Media subsidiary as a short term working capital loan. Sherwood also guaranteed the bank debt of its U.S. Media subsidiary in the amount of $2 million.
 
 
 10
 By October 1970 Sherwood decided that the acquisition had been a bad mistake. It sought to undo the mistake by selling U.S. Media back to its prior beneficial owners. Sherwood made a new agreement to sell the assets and liabilities constituting the U.S. Media business to a newly formed U.S. Media International Corporation (herein "New Media") which was owned by the prior beneficial sellers for consideration consisting of the following:
 
 
 11
 $500,000 in cash;
 
 
 12
 Notes of New Media in the amount of $2,570,000 payable in monthly installments over 8 years bearing interest at 10%, which notes were collateralized by a security interest in New Media's accounts receivable;
 
 
 13
 Cancellation of Sherwood's note for $750,000 which Sherwood had delivered as part of its original purchase;
 
 
 14
 Return of 95% of the Sherwood stock which Sherwood had delivered as part of its original purchase; and
 
 
 15
 5% of the stock of New Media.
 
 
 16
 It was Sherwood's desire by the divestiture to put itself as closely as possible in the financial position it had occupied before the acquisition. In several respects, however, the net effect of the two transactions left its position significantly changed. The most important changes were two:
 
 
 17
 First, while Sherwood had parted with $3 million cash, $2 million to its seller and $1 million loaned to its U.S. Media subsidiary as working capital, it got back only $500,000 in cash in the divestiture, the remainder of the cash outlay being recoverable only over 8 years of monthly payments on the New Media notes;
 
 
 18
 Second, Sherwood had incurred and retained a contingent liability of $2 million, as guarantor of U.S. Media's bank loan.
 
 
 19
 The extent of Sherwood's risk exposure during the eight years of gradual payment of the New Media notes depended in particular on New Media's receivables and collections. The receivables were valued by Andersen's auditors at $6 million as of September 30, 1970. These receivables were first pledged to secure New Media's bank debt of $2 million, which Sherwood had guaranteed. Upon satisfaction of the bank debt, the remainder of New Media receivables were pledged as security for Sherwood's notes. Sherwood accordingly had over $4 million exposure secured by these accounts receivables and the collections thereon.
 
 
 20
 Sherwood's divestiture of U.S. Media was accomplished in October, 1970. Andersen certified the Sherwood financial statements describing the transaction shortly thereafter. Plaintiffs sold their company to Sherwood and acquired their Sherwood notes in March of 1971.
 
 
 21
 In June of 1971, New Media defaulted on the payment of Sherwood's notes. In October of 1971 New Media filed for reorganization under Chapter XI of the Bankruptcy Act. Sherwood collected on only a small portion of its $2,500,000 in notes and further suffered a liability in the amount of $900,000 on its guarantee of New Media's bank debt.
 
 
 22
 Sherwood meanwhile had entered bad times, primarily by reason of the failure of its coal division and its leasing company. Sherwood defaulted on the notes it had issued to plaintiffs in March 1973.
 
 
 23
 Plaintiffs contend that the financial statements certified by Andersen on which plaintiffs relied in accepting Sherwood's long term notes were seriously misleading in their presentation of the Media transaction described above. The claim is not so much that the accounting entries were inaccurate, but rather that descriptive language, particularly in the lengthy footnote 11 to the financial statements, was designed to create the false impression that the acquisition had been "cancelled" in a manner which terminated Sherwood's exposure. Plaintiffs contend that this language was designed to lull the reader to fail to appreciate Sherwood's continuing precarious $4 million exposure following the divestiture.
 
 
 24
 The text of Note 11 is set forth in full in the margin.[1] The portions which plaintiffs contend were particularly misleading are the statements that
 
 
 25
 Sherwood and the selling shareholders (of the U.S. Media assets) agreed . . . to cancel the acquisition and return all consideration previously advanced . . .
 
 
 26
 and that
 
 
 27
 Since the result of this transaction is to effectively cancel the original acquisition, the results of operations of U.S. Media are not included in the accompanying financial statements for any period.
 
 
 28
 Plaintiffs also contended that Andersen's delivery of a "clean" (or unqualified) certifying opinion violated proper accounting principles and that the $500,000 reserve established on Sherwood's books against the possible uncollectibility of the New Media notes was so inadequate as to constitute a fraud.
 
 
 29
 Judge Haight found first that the presentation in the financial statements was not materially misleading, that alleged omissions would not have been material in view of the small importance of the U.S. Media transaction in Sherwood's overall financial picture, and that Andersen was not obligated under the circumstances to take further steps than it took to assess the collectibility of the New Media notes, or to require a larger reserve, or to issue a "qualified" opinion in certifying Sherwood's financial statements. He observed that Note 11 gave a clear and accurate description of the transaction including all of the respects in which Sherwood's position had weakened by paying out cash but getting back notes. In Judge Haight's view, the argument over the use of the word "cancellation," in the face of a full description, amounted to "a semantic squabble of no legal import."[2]
 
 
 30
 In view of our decision on other grounds discussed below, we need not pass on the correctness of this ruling. It may be appropriate, however, to comment on a possible ambiguity. If Judge Haight's opinion is read as signifying that notes and financial statements must be read and evaluated in their entirety and should not be judged by citing words out of context, we agree. On the other hand, his opinion should not be misunderstood to suggest that liability for reckless or intentionally misleading use of palliative, soothing, or optimistic language can be avoided by the inclusion of numbers which, if studied and understood, would contradict the misleading verbal message. See Herzfeld v. Laventhol, Krekstein, Horwath & Horwath, 540 F.2d 27, 37 (2 Cir. 1976). An objective reader of the controversial footnote might well wonder whether the auditors had been overly accommodating to their client's desire to have the transaction look like a wash.
 
 
 31
 Judge Haight also found that plaintiffs had failed to demonstrate scienter, such as would satisfy the requirements established by the Supreme Court in Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).
 
 
 32
 In seeking to interpret the kind and quality of scienter necessary to establish liability after Hochfelder, supra, this court has adhered to the proposition earlier announced in Lanza v. Drexel & Co., 479 F.2d 1277, 1306 (2 Cir. 1973) (en banc) that "reckless conduct will generally satisfy the scienter requirement." See IIT v. Cornfeld, 619 F.2d 909 (2 Cir. 1980). Certain cases have suggested that the sufficiency of reckless conduct may turn on the existence of a fiduciary duty or duty to disclose, see Rolf v. Blyth, Eastman Dillon & Co., Inc., 570 F.2d 38, 44 (2 Cir.), cert. den., 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978) and that, absent any such duty, no liability may be found without a conscious intention to defraud. See Edwards & Hanly v. Wells Fargo Securities Clearance Corp., 602 F.2d 478, 484-85 (2 Cir. 1979) cert. den., 444 U.S. 1045, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980), citing Woodward v. Metro Bank, 522 F.2d 84, 97 (5 Cir. 1975).
 
 
 33
 Judge Haight concluded that recklessness would satisfy the scienter requirement in this case by reason of the foreseeability to the accountant that the certification would be relied on by third parties. Compare Judge Friendly's discussion of Glanzer v. Shepard, 233 N.Y. 236, 135 N.E. 275 (1922) and the scope of the New York law of negligent misrepresentation in Mallis v. Bankers Trust Co., 615 F.2d 68, 81-83 (2 Cir.), cert. pending, 48 U.S.L.W. 3626 (1980). See Gold v. DCL Inc., 399 F.Supp. 1123, 1127 (S.D.N.Y.1973); Prosser, Misrepresentation and Third Persons, 19 Vand.L.Rev. 231 (1966); Note, Accountants' Liabilities for False and Misleading Financial Statements, 67 Colum.L.Rev. 1437 (1967). We need not pass on whether proof of recklessness is sufficient to make out a cause of action in view of Judge Haight's finding that no recklessness was shown.
 
 
 34
 Judge Haight found no reckless disregard for the truth. He concluded that Andersen's failures were at worst "judgmental," not rising "above the level of negligence,"[3] and thus non-actionable under Hochfelder. These findings were reasonably supported by the evidence.
 
 
 35
 Judge Haight found that Andersen's audit team had perceived the collectibility of the New Media notes as an important focus of inquiry which in turn depended for security on the extent and collectibility of New Media's receivables. Accordingly they devised a ten-step program to evaluate New Media in these respects.
 
 
 36
 Based on figures and projections furnished primarily by New Media, Andersen concluded that New Media had growing sales proceeding for the current year at a rate exceeding $17,800,000, with booked orders totaling $5,900,000 for the next four months. It observed that New Media's accounts were "mostly major firms".[4]
 
 
 37
 A summary prepared by Andersen concluded that New Media's "cash projections (were) . . . reasonable and attainable . . . (and that the) cash flow shows the ability to pay principal and interest on the Sherwood notes without any detriment to its cash position."[5] Andersen interviewed New Media's bankers and found "no plans to request payment against their $2,000,000 loan."[6] The New Media receivables were found to be more than adequate security to cover the bank debt and the Sherwood notes. Andersen also obtained and relied on an opinion of Sherwood's counsel to the effect that Sherwood's lien on the Media receivables was enforceable. Based on these investigations, Andersen concluded that "a reserve for collectibility of $500,000 would be sufficient."[7]
 
 
 38
 Judge Haight was convinced that Andersen made those investigations and observations in good faith and was justified in issuing a clean opinion.
 
 
 39
 Plaintiffs argued both here and below that Andersen could not reasonably have accepted and relied on the information furnished by New Media's executives and should have discredited the opinion of counsel which failed to acknowledge the 120 day gap during which Sherwood's lien would not take priority over New Media's other debts in case of New Media's bankruptcy. Those contentions were fully considered by Judge Haight who was not persuaded by them. His findings depended in significant part on his assessment of the credibility of Andersen's witnesses. Those findings were adequately supported by the evidence and may not be disturbed on appeal. See Van Alen v. Dominick & Dominick, Inc., 560 F.2d 547, 551 (2 Cir. 1977); Rolf v. Blyth, Eastman Dillon & Co., supra, 570 F.2d at 44.
 
 
 40
 The judgment of the trial court is affirmed.[8]
 
 
 
 *
 Of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 11. Cancellation of Acquisition:
 In November 1969, the Company entered into an agreement to acquire the net assets of U.S. Media International Corporation for a purchase price that was to be based on the net earnings of the acquired business for the eleven months ended February 28, 1970. In January, 1970 the agreement was finalized and the net assets transferred to a wholly-owned subsidiary of the Company. At that time Sherwood released, as a preliminary payment for the acquisition, $2,000,000 in cash, a promissory note for $750,000, and 303,571 shares of Sherwood common stock.
 Because of difficulties encountered in complying with certain provisions of the agreement, both Sherwood and the selling shareholders agreed, subsequent to February 28, 1970, to cancel the acquisition and return all consideration previously advanced. This cancellation was finalized on October 30, 1970 and, at that time, Sherwood received $500,000 in cash, a 10% note receivable from U.S. Media for $1,570,000 and 280,485 of its previously issued shares. In addition, the $750,000 promissory note was cancelled and Sherwood received a five percent stock interest in U.S. Media as partial compensation for the 23,086 Sherwood shares that could not be returned. The note receivable is payable in 63 equal monthly installments of approximately $32,000 including interest. In May 1970, Sherwood advanced $1,000,000 to U.S. Media as a short-term working capital loan. This loan (not reflected in the accompanying balance sheet) is repayable in 36 equal monthly installments, commencing the month following the final installment on the $1,570,000 note referred to above, with 10% interest payable quarterly. Both amounts are collateralized by a security interest in U.S. Media's accounts receivable. Such receivables also collateralize a $2,000,000 demand loan payable to a bank which has been guaranteed by Sherwood. The Company has provided for the write-off of all costs incurred in connection with this transaction ($250,000) and a $500,000 reserve for possible future losses in collection of the $2,570,000 of notes receivable. This provision is shown in the accompanying statement of income as an extraordinary charge net of the future income tax benefits ($305,000) applicable to such provision and the estimated tax benefits ($315,000) arising from losses incurred by U.S. Media during the period for which it will be treated as a subsidiary of Sherwood for tax purposes.
 Since the result of this transaction is to effectively cancel the original acquisition, the results of operations of U.S. Media are not included in the accompanying financial statements for any period.
 1094a (page references to joint appendix on appeal).
 
 
 [2]
 Op. below at 95,691
 
 
 [3]
 Op. below at 95,701
 
 
 [4]
 1284a
 
 
 [5]
 1285a
 
 
 [6]
 Id
 
 
 [7]
 Id
 
 
 [8]
 Judge Haight found that liability was also barred by plaintiffs' failing to prove "loss causation." Because we affirm the judgment of the court below on the issue of scienter, we expressly refrain from considering the validity of this loss causation analysis. See Marbury Management, Inc. v. Kohn, No. 79-7364, (2 Cir. 1980)