**WHITBREAD (US) HOLDINGS, INC., Plaintiff,**

v.

**BARON PHILIPPE DE ROTHSCHILD, S.A., and Oy Alko Ab, Defendants.**

No. 85 Civ. 2342 (GLG).

United States District Court, S.D. New York.

March 18, 1986.

Shereff, Friedman, Hoffman & Goodman, New York City, for plaintiff; Robert J. Jossen, Richard D. Weinberg, Alyson B. Cummings, of counsel.

Gilbert, Segall & Young, New York City, for defendant Oy Alko Ab; H. Barry Vasios, Richard B. Schaeffer, Charles Skop, of counsel.

GOETTEL, District Judge.

In this action, plaintiff Whitbread (US) Holdings, Inc. ("Whitbread") alleges that defendants Baron Philippe de Rothschild, S.A. ("Rothschild") and Oy Alko Ab ("Alko") fraudulently induced Whitbread to purchase Buckingham Corporation ("Buckingham"). The amended complaint asserts claims under both federal and state securities laws and under the common law of fraud. Before the Court is defendant Alko's motion to dismiss the amended complaint.

I. Background

A. Factual Background

The amended complaint alleges the following facts which we must accept as true for purposes of evaluating the motions to dismiss. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101, 2 L.Ed.2d 80 (1957).

Defendant Alko is the Finnish state monopoly corporation for the production and sale of alcoholic beverages, including "Finlandia" vodka. Defendant Rothschild is a French corporation principally engaged in the manufacture and export of wines, including "Mouton-Cadet," the largest selling French appellation controllee wine in the world.

In June 1984, Beatrice Companies, Inc. ("Beatrice") announced its intention to sell Buckingham, one of its subsidiaries. Buckingham, an importer and distributor of wines and liquors, had previously entered into distribution agreements with Rothschild and Alko. Both suppliers could terminate their distribution agreement upon three months notice in the event that Buckingham underwent a "change in control." By the end of July or early-August 1984, both Alko and Rothschild had decided to terminate their respective agreements upon a sale of Buckingham. Although Alko had earlier expressed interest in purchasing Buckingham, it abandoned that interest after a July 26 meeting with Beatrice representatives in Chicago.

Rothschild, Alko, and Steven Karp ("Karp"), then Buckingham's Senior Vice-President, thereafter discussed and agreed to establish a joint venture to directly distribute the Rothschild and Alko products in the United States. Karp, Rothschild, and Alko met on several occasions during August, September, and October. On August 18 and 19, 1984, Karp met with representatives of Rothschild and Alko in Biarritz, France. At the conclusion of the Biarritz meeting, Rothschild and Alko agreed in principle to act together to distribute the Rothschild and Alko products once the sale of Buckingham was completed. They also allegedly agreed to cooperate to ensure that Buckingham sold Beatrice, thereby activating the termination provisions in their distribution contracts with Buckingham. Karp again met with representatives of Alko and Rothschild on September 20, 1984, in Lausanne, Switzerland. At this meeting, the participants reviewed draft agreements, prepared by Karp's attorney, for implementing the joint venture. At an October 2 meeting in New York, the co-venturers further refined their arrangements.

In order to achieve their objectives, it was necessary for Alko, Rothschild, and Karp to ensure that no one, especially a potential purchaser of Buckingham, would discover their plans until Buckingham was sold. Rothschild and Alko recognized that a prospective purchaser would not enter into a transaction for Buckingham unless it believed that a long-term arrangement to distribute their brands would be available. If a potential purchaser knew it had no chance of keeping the Rothschild and Alko distribution rights, the sale of Buckingham would not include those rights, and Rothschild and Alko would be unable to terminate their distribution agreements.

During August, September, and October 1984, Whitbread, whom Alko knew to be interested in purchasing Buckingham, arranged a series of meetings with Alko to ascertain if Whitbread would retain the Finlandia distribution rights following a Buckingham purchase. During these meetings, Alko representatives allegedly made numerous misrepresentations concerning Alko's future plans for United States distribution. During three August meetings, Alko stated that it could not negotiate with Whitbread because Alko was itself a serious contender for Buckingham. At formal and informal meetings during September and October, Alko representatives told Whitbread that serious "corporate/political" problems were impeding possible negotiations between Alko and Whitbread. Whitbread was assured that, notwithstanding Alko's formal representations to the contrary, Alko was not a serious contender for the purchase of Buckingham and would not, in fact, acquire Buckingham. Whitbread's representatives were further assured by Alko's representatives that if and when Whitbread acquired Buckingham, Alko would accord Buckingham a fair and equal opportunity to retain the exclusive United States distribution rights to Finlandia vodka.

In August and September 1984, Whitbread held similar meetings with Rothschild representatives, who assured Whitbread that Rothschild had no plans to directly distribute their products in the United States. The Rothschild representatives also stated that if Rothschild was satisfied with the new owner's performance during a trial period following the sale of Buckingham, a long-term agreement would be implemented. The Rothschild representatives also told Whitbread that, in order to protect their options, Rothschild would exercise the change in control termination provisions upon a sale of Buckingham, but that this termination was designed to assure a trial period in which Rothschild could evaluate the new owner. Of course, neither Alko nor Rothschild told Whitbread of their agreement with Karp.

On October 20, 1984, Whitbread agreed to purchase Buckingham. The sale was consummated on November 26, 1984, when Whitbread paid Beatrice $110 million for all of Buckingham's outstanding stock.[1] Whitbread alleges that the defendants' misrepresentations and omissions had a definite and calculable impact on the price that Whitbread paid for Buckingham. Had it known the truth, Whitbread allegedly would have paid less. Conversely, it allegedly received less than it paid for.

### B. Procedural Background

Whitbread commenced this action on March 26, 1985. On July 12, 1985, the Court dismissed the original complaint, with leave to replead, for failure to plead fraud with the particularity that Fed.R. Civ.P. 9(b) demands. The plaintiff filed its first amended complaint on September 6, 1985.

### 1. The Amended Complaint

The amended complaint alleges that Alko made material misrepresentations and

---

1. On November 27, 1984, Rothschild and Alko notified Buckingham that they were terminating their distribution agreements. Although Alko and Rothschild subsequently solicited alternative proposals for their brands' distribution rights (Whitbread submitted a detailed proposal), the amended complaint alleges that these solicitations were a sham designed to cover up the Alko-Rothschild-Karp agreement.

omissions thereby inducing Whitbread to purchase Buckingham in violation of section 10(b) of the Securities Act of 1934, 15 U.S.C. § 78j(b) (1982), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.-10(b)–5 (1985), and in violation of the common law of fraud. Alko is also alleged to have aided and abetted Rothschild's similar statutory and common law wrongs. Alko is also allegedly liable for Rothschild's wrongs as a co-conspirator. The amended complaint seeks punitive damages on the common law fraud claim, and attorney's fees on the securities act claim. It also purports to state a claim under the "applicable state securities laws," which, the plaintiff informs us, include sections 339–a & 352–c of New York's "Martin Act," N.Y. Gen.Bus.Law §§ 339–a & 352–c (McKinney 1968 & 1984).[2]

### 2. Motions Before the Court

Defendant Alko now moves, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss each of Alko's claims for failure to state a claim on which relief can be granted.[3] Alternatively, it asks the Court to again dismiss the amended complaint for failure to plead fraud with particularity. Finally, Alko asks the Court to strike the plaintiff's de-

mand for punitive damages and attorney's fees.[4]

## II. Discussion

### A. The Primary Securities Law Violation

#### 1. Motion to Dismiss for Failure to State a Claim

"In order to state a claim for relief under Section 10(b) and Rule 10b–5,[5] a plaintiff must allege that, in connection with the purchase or sale of a security, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's actions caused him injury." *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 61 (2d Cir.1985). "To establish causation, the plaintiff must show 'both *loss causation* —that the misrepresentations or omissions caused the economic harm—and *transaction causation*—that the violations in question caused the [plaintiff] to engage in the transaction in question.'" *Bennett v. United States Trust Co.,* 770 F.2d 308, 313 (2d Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986) (quot-

---

**2.** We do not have before us sufficient facts to determine whether the law of New York applies to this case. Neither party has suggested that we apply any other law, so, for purposes of this motion, we assume that the common and statutory laws of New York apply.

**3.** Both Whitbread and Alko presented materials outside of the pleadings for the Court's consideration on this motion. The Court has determined to exclude these materials and declined to convert this into a motion for summary judgment. *See* Fed.R.Civ.P. 12(b).

**4.** Rothschild answered the amended complaint on August 26, 1985 and has not joined in Alko's motion.

**5.** Section 10(b), 15 U.S.C. § 78j (1982), provides in pertinent part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
(b) To use or employ, in connection with the purchase or sale of any security registered

on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b–5, 17 C.F.R. § 240.10b–5 (1985), promulgated pursuant to section 10(b), provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

ing *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 380 (2d Cir.1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975)) (emphasis in original). The defendant contends that the complaint does not allege (1) an actionable misrepresentation or omission, (2) reliance, or (3) loss causation. It also argues that the plaintiff's damages are so speculative as to warrant dismissal of its Rule 10b–5 claim as a matter of law.

### a. Misrepresentation

■ Alko's contention that the amended complaint alleges no more than a refusal by Alko to negotiate with Whitbread is incorrect. In fact, the amended complaint alleges a series of false statements by Alko, each of which expressly or implicitly represented to Whitbread that it would eventually have an opportunity to negotiate for the Finlandia distribution rights.

Alko's representatives [6] initially stated to Whitbread that Alko could not negotiate with Whitbread because Alko was itself negotiating for Buckingham. Alko thereby indicated that Whitbread would have a fair opportunity to negotiate for the Finlandia distribution rights if Whitbread purchased Buckingham.

Alko later admitted that it was no longer bidding for Buckingham. However, it maintained that it could not negotiate with Whitbread because the possible acquisition of Buckingham had become a "corporate/political" issue within Alko. This excuse allegedly was a lie. Together with Alko's representation that the issue would eventually resolve itself, the false excuse encouraged Whitbread to believe that it would eventually have an opportunity to negotiate. Were these subtle misrepresentations not sufficient, the amended complaint alleges that, on three occasions, Alko's representatives expressly stated to Whitbread that it would have a fair and equal opportunity to negotiate for the distribution rights once the "corporate political" issue was resolved.

The import of these allegations is clear. Alko did not merely refuse to negotiate. It represented that Whitbread would eventually have an opportunity to negotiate, when Alko knew that Whitbread would never have that opportunity.[7] Read in the manner urged by the plaintiffs, as they must be on this motion to dismiss, the statements that Whitbread attributes to Alko constitute misrepresentations. *See Oleck v. Fischer*, 623 F.2d 791, 794 (2d Cir.1980) (Statements alleging fraud must be "read and evaluated in their entirety and should not be judged by citing words out of context.").

### b. Omission

■ Alko's omissions are actionable as well. When one party undertakes to communicate information to another who it knows will use that information in connection with a securities purchase, the former assumes a duty "to communicate any additional or qualifying information, then known, the absence of which would render misleading that which was communicated." *Rose v. Arkansas Valley Environmental & Utility Authority*, 562 F.Supp. 1180, 1206–07 (W.D.Mo.1983) (terming this a "duty not to omit."; *First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1317 (5th Cir.1977), *cert. denied*, 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978). This variation on the obligation to speak truthfully is incorporated in Rule 10(b)–5 which makes it unlawful for a person "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in

---

**6.** The defendant attempts to discount the alleged misrepresentations by attributing them to "marketing people." The speakers' status and their authority are issues of fact not properly before us on this motion to dismiss.

**7.** In its memorandum, the plaintiff states that Alko's misrepresentations "amounted to ...

more than a ... promise to negotiate." Plaintiff's Memorandum in Opposition at 23. In our view, this statement mischaracterizes the amended complaint, which nowhere alleges that Alko or its representatives stated that Whitbread would retain the Finlandia distribution rights.

light of the circumstances under which they were made, not misleading...." 17 C.R.R. § 240. 10b–5(b)(1985). Once Alko explained its refusal to negotiate, it assumed a duty to explain truthfully.[8]

The Fifth Circuit found similar omissions actionable in *First Virginia Bankshares v. Benson, supra,* 559 F.2d 1307. In that case, a broker acting on behalf of a potential purchaser of "Benson," a small consumer finance company, approached defendant "Heller," a commercial lending institution. Heller, which had provided financing for Benson, knew that Benson was experiencing financial difficulties. Heller stated that his experience with Benson had been satisfactory. He disclosed none of the negatives of which he was aware. In reliance on Heller's representations, the plaintiffs purchased Benson. The court affirmed the jury's finding that Heller was liable under Rule 10b–5 for failing to disclose his knowledge about Benson. Even though Heller had no pre-existing duty to disclose facts to the plaintiff, once it spoke, it had an obligation to speak the truth. Once Alko spoke, it had the same obligation.

Imposing a duty on Alko in these circumstances may, at first blush, appear unfair. Once Whitbread approached Alko, Alko's choices were limited. "Should we have refused to speak with Whitbread?," Alko may ask. However, Alko's quandry was a foreseeable consequence of the scheme upon which it had embarked. This far-reaching consequence of its alleged wrongdoing evokes little sympathy. Alko could have said nothing and avoided the difficulties entirely. It chose instead to speak in furtherance of its own interests and must suffer the consequences of its actions.[9]

### c. Reliance

■ Alko next asks the Court to find that Whitbread's alleged reliance on Alko's representations and omissions was reckless and, therefore, unreasonable. By this entreaty, we are drawn to the familiar adage that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). In order to survive a motion to dismiss a Rule 10b–5 claim, a plaintiff need only plead that he relied on the defendant's misrepresentations. The reasonableness of any reliance is an issue of fact. *Johnson & Staley, Inc. v. Bushan & Levy,* 527 F.Supp. 1159, 1162 (S.D.N.Y.1981).

What's more, reliance becomes a non-issue once Alko's alleged omissions foreclose the reliance issue. Reliance is presumed in a fraud case based on omissions of material facts, *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). Likewise, materiality is a question for the finder of fact. *Osofsky v. Zipf,* 645 F.2d 107, 115 (2d Cir.1981).

### d. Loss Causation

■ The defendant maintains that the plaintiff is required to precisely plead how

---

8. *Greenfield v. Heublein, Inc.,* 742 F.2d 751 (3d Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1189, 84 L.Ed.2d 336 (1985), cited by the defendant, is inapposite. That case holds that corporate officers have no duty to disclose merger negotiations to shareholders until fundamental agreement is reached on both the price and the structure of the merger. The prospect of corporations disclosing each and every merger proposal plainly troubled the court, which was careful to limit the case to its particular facts. The *Heublein* court's concerns about overregulating corporate disclosure and inhibiting merger discussions are not relevant in this case. Although Alko may have had a duty to disclose to a potential purchaser, it had no duty to the general public or to a particular class of shareholders. Even if the *Heublein* case were applicable, it would not foreclose the plaintiff's claim, which alleges that, as of August 20, 1984, Alko, Karp, and Rothschild had fundamentally agreed on the terms of their arrangement.

9. One need not be a party to a securities transaction to be liable under Rule 10b–5. *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 860 (2d Cir.1968), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). Liability may befall one like Alko which actively induces a transaction to which it is not a party. *See Sprayregen v. Livingston Oil Co.,* 295 F.Supp. 1376 (S.D.N.Y.1968).

its omissions and misrepresentations proximately caused the plaintiff's economic loss. Such precision is unnecessary at this stage. *Cf. Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 380 (2d Cir.1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975) (Loss causation "is demonstrated rather easily by proof of some form of economic damage...."). Whitbread's allegation that Alko's misrepresentations and omissions caused it to bid and pay more for Buckingham than it otherwise would have is sufficient. The defendant's further contention that Whitbread could not have purchased Buckingham sans Alko for the price it was willing to pay is premature. Resolution of that issue is for the finder of fact. "[T]he problem with [the defendant's argument] is that it asks the Court to make a determination of fact before trial, even before discovery, with no proper evidentiary record to serve as a basis of the for that finding." *Houlihan v. Anderson-Stokes, Inc.,* 434 F.Supp. 1330, 1339 (D.D.C.1977).[10]

The defendant relies on *Bennett v. U.S. Trust Co., supra,* 770 F.2d 308, in which the Second Circuit affirmed dismissal of a claim for failure to allege loss causation. That case stands in sharp contrast to the case at bar. In *Bennett,* the plaintiffs bought utility stock on margin and deposited the stock with defendant U.S. Trust as collateral. The dividends proved insufficient to service the plaintiff's debt, and the plaintiff's debt increased. When the market value of the stock declined precipitously, the plaintiffs liquidated their remaining equity and used $1 million in additional funds to pay off their debts to U.S. Trust. In their action against U.S. Trust to recover all of their losses, the plaintiffs claimed that U.S. Trust had induced them to open their account by misrepresenting its margin requirements. The court found that U.S. Trust had not advised the plaintiffs to purchase a particular stock. Although the plaintiffs had alleged transaction causation, *i.e.,* that they would not have invested with U.S. Trust had they known of the margin requirements, they had not alleged that U.S. Trust's misrepresentations caused their losses. Those were a product of the plaintiff's own, poor investment decisions.

By contrast, Alko's misrepresentations not only induced Whitbread to purchase Buckingham. They also allegedly determined, at least in part, how much Whitbread was willing to pay. Whitbread has alleged both transaction and loss causation.

### e. Speculative Damages

One who states an actionable claim under Rule 10(b)–5 is entitled to compensation "for economic loss suffered as a result of [the] wrongs committed ... whether the measure of those compensatory damages be out-of-pocket loss, the benefit of the bargain, or some other appropriate standard." *Osofsky v. Zipf,* 645 F.2d 107, 111 (2d Cir.1981). A court may, however, refuse to entertain an action when the damages alleged are so speculative as to defy calculation. *Barrows v. Forest Laboratories, Inc.,* 742 F.2d 54 (2d Cir.1984). The defendant argues that this is such a case. We do not agree.

As we understand the amended complaint, the plaintiff seeks to recover the difference between the price it paid for Buckingham, and the price it would have paid had it known that it would not have a fair and equal opportunity to negotiate for the Alko and Rothschild distribution rights.[11] The damage calculations will be far from simple, perhaps requiring consid-

---

**10.** In paragraph 43 of the amended complaint, it is alleged that "Whitbread had valued Buckingham at a maximum worth of $80–85 million without the Rothschild and Alko distributorship agreements, and Alko and Rothschild knew that Beatrice had earlier rejected an offer of $90 million for Buckingham." Thus, by Whitbread's own admission, in order for it to have sustained any damages from Alko's misrepresentations and omissions, it would have had to have placed a minimum value of $5 million on Alko's promise to negotiate. Although that figure may strike some as high, the measurement is not for the court.

**11.** Whitbread prefers to characterize its damages as the difference between what it paid for Buckingham and Buckingham's actual value at the time of its purchase. Presumably, Buckingham's actual value equates to that which Whitb-

erable expert testimony. Indeed, Alko's papers sought to place before the Court a number of factors which, if proven, could cast serious doubt on the viability of any claim for damages. But none of the potential pitfalls in proving damages convince us, at this time, to conclude that Whitbread's damage claims are so speculative as to defy proof as a matter of law. Discovery on the damage questions must proceed apace to facilitate an ultimate determination as to whether Alko's alleged misrepresentations and omissions actually damaged Whitbread.

Alko presents several cases to support its argument that Whitbread's damages are too speculative. All, however, are distinguishable. Alko relies heavily on *Candid Productions, Inc. v. International Skating Union*, 530 F.Supp. 1330 (S.D.N.Y. 1982), a decision by Judge Weinfeld. The plaintiff in that action sought to recover for the breach of a promise to negotiate in good faith. The court dismissed the claim, finding that obligation was "so vague and indefinite that there [was] no basis or standard for deciding whether the agreement had been kept or broken...." *Id.* at 1333–34. The defendant emphasizes a passage from the *Candid Productions* opinion quoting *Necchi S.P.A. v. Necchi Sewing Machine Sales Corp.*, 348 F.2d 693 (2d Cir.1965), *cert. denied*, 383 U.S. 909, 86 S.Ct. 892, 15 L.Ed.2d 664 (1966). The claim in that case was that the defendant had breached an agreement to negotiate in good faith an extension of a distributorship agreement. The court in *Necchi* stated,

> [I]t is impossible to say what relief would be appropriate if Necchi failed to examine the possibility of a renewal. Certainly, we cannot ask that a renewal contract be written for the parties, as it is altogether too conjectural that the parties would have agreed and on what terms. It is impossible to assess any damages, as there is no way that anyone could foresee what would have come from examining the possibility of executing a new contract, even if this were done in the utmost good faith.

*Id.* at 698, *quoted in Candid Productions, supra*, 530 F.Supp. at 1336. In *Necchi* and *Candid Productions*, the courts were concerned with the difficulty both of determining whether a contract is sufficiently definite and of measuring the benefit of a party's bargain. Neither concern is implicated in this fraud claim. We do not have to decide what Alko's contract with Whitbread would have said, nor do we need to determine how Whitbread might have benefitted from its bargain.

The plaintiffs in *Barrows v. Forest Laboratories, Inc.*, 742 F.2d 54 (2d Cir.1984), sold their business in 1969 to Forest Laboratories, Inc. ("Forest") in exchange for $550,000 in Forest common stock then trading at $25 per share. Subsequently, Forest disclosed that, at the time of the sale, Forest's officers had overstated its earnings. The plaintiffs, who had retained most of their Forest stock, then brought suit, alleging that the stock they had received was worth substantially less than its $25 market value. Beginning in 1980, the price of Forest stock rose sharply. The plaintiffs sold their remaining shares for approximately $750,000. After this sale, and two and one-half years after they had originally filed suit, the plaintiffs moved to amend their complaint to add new theories of relief. Their first new claim

> asserted that, at the time the Barrows sold their business, the market price of Forest stock was grossly inflated as a result of the fraud perpetrated by [Forest]; that the stock was then actually worth no more than $1.50 per share, instead of the $25 per share at which it was being traded; and that the Barrows were therefore entitled to 335,355 additional shares—that is the number of shares that would have been necessary to pay the Barrows $550,000 if the stock, at the time of the sale of their business, had been valued at its "true" value of $1.50 per share.

*Id.* at 56.

The Court of Appeals affirmed the district court's refusal to permit an amend-

---

read would have paid for Buckingham had Whitbread not been misled.

ment of the complaint to add this claim. After noting that the district court "was well within its discretion in concluding that [the] new claims would prejudice [the defendants] by substantially altering the complaint's theories of relief and delaying the trial of the case," *id.* at 60, the court commented briefly on the merits of the claim. It remarked that the measure of damages sought, the difference between the actual and the market value of the Forest stock at the time of the merger, was "unduly speculative." *Id.* at 60. "Equally speculative [was] ... whether the parties would have reached any agreement if Forest's true financial condition had been known...." *Id.* "A claim for benefit-of-the-bargain damages," said the court, "must be struck, not on the basis on a bargain whose terms must be supplied by hypothesis about what the parties would have done if the circumstances surrounding their transaction had been different." *Id.* Moreover, the requested recovery, shares worth $14 million comprising 30 percent of Forest's stock, would have been a windfall for the plaintiffs.

The factors that influenced the *Barrows* court are largely absent here. First off, this is a motion to dismiss not to amend the complaint. Our decision is not discretionary, nor is the prospect of delay a relevant factor. Moreover, Whitbread is not seeking a windfall but its out-of-pocket loss. It may indeed be difficult to determine how much Whitbread would have spent for Buckingham and whether its offer would have prevailed. The plaintiff may also have problems establishing its damages by showing how much less Buckingham was worth than the amount paid. But defining out-of-pocket damages necessarily requires some such speculation. *Barrows* is of little help to the defendant.

*Call Carl, Inc. v. BP Oil Corp.*, 554 F.2d 623 (4th Cir.), *cert. denied*, 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977), decided under Maryland law, is even less helpful. In *Call Carl*, the plaintiffs, retail gasoline dealers, alleged that BP had fraudulently represented its intention to renew their distribution agreements. The court declined to award the dealers the profits they would have made had the contracts been renewed.[12] Whitbread seeks nothing like the speculative expectancy that the court rejected in *Call Carl.*[13]

The plaintiff's damages are not so speculative as to warrant dismissal of its Rule 10b–5 claim as a matter of law. Since all of the elements of a 10b–5 claim have been adequately alleged, the plaintiff's motion to dismiss the 10b–5 claim for failure to state a claim on which relief can be granted, is denied.[14]

2. **Motion to Dismiss for Failure to Plead Fraud with Particularity**

Alko also moves, pursuant to Fed.R. Civ.P. 9(b), to dismiss the claims against it for failure to plead fraud with particularity. Rule 9(b) provides that "[i]n all averments of fraud ... the circumstances constituting the fraud ... shall be stated with particularity." Fed.R.Civ.P. 9(b). Mere

---

12. Concerns related to the parole evidence rule, not relevant in this case, also influenced the court in *Call Carl, Inc. v. BP Oil Corp.*, 554 F.2d 623, 630 (4th Cir.) *cert. denied*, 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977) ("But damages for loss of an expectancy of profits created by prior or contemporaneous oral representations plainly contradictory with the terms of a written contract we believe to be nonrecoverable if written contracts are to retain significance.").

13. The *ad damnum* clause in the amended complaint seeks actual damages of not less than $45 million. The damages arising out of the fraud alleged in the amended complaint can not, however, exceed the difference between the $110 million that Whitbread paid for Buckingham

and the $80/85 million value that Whitbread had placed on a Rothschildless, Alkoless Buckingham. Although Karp's misappropriation of business information and the departure of key personnel may also have damaged Whitbread, a claim that would give rise to those damages does not appear as part of this amended complaint.

14. Alko moved to dismiss the common law fraud claim in the second cause of action for the same reasons that it moved to dismiss the 10b–5 claim. Assuming arguendo that the same strict requirements apply to pleading common law fraud under the law of New York, the common law claim withstands scrutiny under state as well as federal law.

conclusory allegations that the defendant's conduct was fraudulent are not enough. *Decker v. Massey-Ferguson*, 681 F.2d 111, 114 (2d Cir.1982). Instead, the complaint must allege with some specificity the act or statements constituting the fraud. *Ross v. A.H. Robbins Co.*, 607 F.2d 545, 557 (2d Cir.1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980). This means that the complaint must state the time, place, and content of the misrepresentation, and the person responsible for making (or, in the case of omissions, not making) same, and what was obtained or given up as a consequence of the fraud. *Posner v. Coopers & Lybrand*, 92 F.R.D. 765, 769 (S.D.N.Y.1981), *aff'd without opinion*, 697 F.2d 296 (2d Cir.1982); 2A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 9.03, at 9–20 through 9–24 (1984) (footnote omitted).

■ Although paragraph 7 of the amended complaint, to which the defendant points, merely summarizes the plaintiff's allegations, the 52d through 54th paragraphs plead Alko's misrepresentations and omissions in exquisite detail. In particular, the four subparagraphs of the 54th paragraph detail a variety of misrepresentations, stating when, where, and by whom they were made. Alko's principal omission, its failure to state that it had reached agreement with Rothschild and Karp, is also alleged. Although the amended complaint does not set forth a precise damage figure, it states that the fraud caused Whitbread to pay more than it would otherwise have paid for Buckingham. This statement puts the defendants on notice of the type of damages it seeks. Rule 9(b) requires no more. *Goldman v. Belden*, 754 F.2d 1059, 1069–70 (2d Cir.1985). Alko's motion to dismiss for failure to plead fraud with particularity is denied.

### B. The Aiding and Abetting and Conspiracy Claims

The amended complaint charges that Alko is liable for Rothschild's securities law violations as both an aider and abettor and a co-conspirator. Alko moves to dismiss both of these claims for failure to state a claim on which relief can be granted. For the reasons stated below, both motions are denied.

### 1. Aiding and Abetting

■ In order to state a claim for aiding and abetting a securities law violation, a plaintiff must allege and prove "(1) a securities law violation by a primary wrongdoer, (2) knowledge of the violation by the person sought to be charged, and (3) proof that the person sought to be charged substantially assisted in the primary wrongdoing." *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir.1983). The plaintiff has little trouble satisfying these requirements.

Rothschild is alleged to have violated the securities laws in the same manner as Alko. At a minimum, Rothschild allegedly misrepresented to Whitbread that it intended to give it an opportunity to negotiate for the rights to distribute its wines. Our earlier discussion disposes of any contention that these allegations do not state a claim under Rule 10b–5.

Whitbread has alleged sufficient facts from which Alko's knowledge of Rothschild's conduct can be inferred. Specifically, Alko and Rothschild are alleged to have agreed to take no action that would prevent the sale of Buckingham. It is fair to infer that they knew of each other's conduct in this regard.[15]

Paragraph 7(d) of the amended complaint alleges that Alko falsely stated to Whitbread that Alko knew nothing of Rothschild's intentions. This affirmative misrepresentation, designed to assist Rothschild in misleading Alko, constituted substantial assistance in its grossest form. Alko's silence also satisfies the substantial assistance requirement. Although inaction ordi-

---

**15.** In this circuit, if the alleged aider and abettor owes a fiduciary duty to the plaintiff, recklessness, not knowledge of the violation, need only be alleged. *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir.1983). Since the amended complaint relies on Alko's knowledge, the Court need not consider whether Alko had a fiduciary duty to Whitbread or whether Alko was reckless.

narily does not constitute substantial assistance, it may provide a predicate for liability if the defendant consciously intends its silence to aid the primary fraud. *Armstrong v. McAlpin, supra,* 699 F.2d at 91; *IIT, An International Investment Trust v. Cornfeld,* 619 F.2d 909, 925–27 (2d Cir.1980). The amended complaint alleges the requisite conscious intention.

"[I]n order to be held as an aider and abettor, a person must 'in some sort associate himself with the venture, that he participate in it as something that he wishes to bring about, that he seek by his action [or inaction] to make it succeed.'" *IIT v. Cornfeld, supra,* 619 F.2d at 922 (quoting *United States v. Peoni,* 100 F.2d 401, 402 (2d Cir.1938) (Hand, J.)). This language aptly characterizes Alko's alleged conduct. The motion to dismiss the aiding and abetting claim is denied.

## 2. Conspiracy

In order to establish liability for a conspiracy to violate the securities laws, a plaintiff must plead and prove (1) an agreement between the conspirator and the wrongdoer; and (2) a wrongful act committed in furtherance of the conspiracy. *See Hill v. Equitable Bank, National Association,* 599 F.Supp. 1062, 1083 (D.Del.1984); *Troyer v. Karcagi,* 476 F.Supp. 1142, 1153 (S.D.N.Y.1979).

It is not enough merely to state that a conspiracy has taken place. Where possible, there should be some details of time and place and the alleged effect of the conspiracy. This is not to say that the pleader must plead his evidence; further details may be secured by means of discovery, and related devices. Moreover, great leeway should be allowed the pleader, since by the nature of the conspiracy, the details may not be readily known at the time of the pleading.

*Kravetz v. Brukenfeld,* 591 F.Supp. 1383, 1387–88 (S.D.N.Y.1984) (quoting 2A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 8.17[5], at 8–180 through 8–183 (1984) (footnotes omitted)). *See also Rooney Pace, Inc. v. Reid,* 605 F.Supp. 158, 162

(S.D.N.Y.1985) (Weinfeld, J.) (Evidence of conspiracy must await discovery; motion to dismiss conspiracy claim denied.).

■ The pleadings more than suffice to allege a conspiracy. The plaintiff alleges numerous meetings between Alko and Rothschild, specifying the time and place of each meeting. *See, e.g.,* Amended Complaint ¶¶ 26, 32, 39, 42. The amended complaint also details the joint venture agreement between Rothschild, Alko, and Karp. It is further alleged that "Rothschild and Alko ... conspired to mislead any prospective purchaser of Buckingham with respect to their true intentions...." Amended Complaint ¶ 45. The structure of the agreement and the circumstances under which it was made need not be alleged down to the last detail.

The amended complaint also alleges the requisite wrongful acts, statements by Alko and Rothschild to Whitbread in furtherance of the objectives of the alleged conspiracy. Alko's motions to dismiss the claims against it for conspiring with and aiding and abetting Rothschild are denied.

## C. The Demands for Punitive Damages and Attorney's Fees

Finally, the defendant moves to strike the demands for punitive damages and attorney's fees in the amended complaint.

## 1. Punitive Damages

■ Although an award of punitive damages is not available for violations of Rule 10(b)–5, punitive damages may sometimes be recovered on a pendant state claim. *Flaks v. Koegel,* 504 F.2d 702, 706–07 (2d Cir.1974). In order to state a claim for punitive damages under New York law, a complaint alleging fraud must plead and prove "gross, wanton, or willful fraud or other morally culpable conduct." *Borkowski v. Borkowski,* 39 N.Y.2d 982, 355 N.E.2d 287, 387 N.Y.S.2d 233 (1976): "Proof of acts aimed at the public generally is not required." *Whitney v. Citibank, N.A.,* 782 F.2d 1106, 1118 (2d Cir.1986) (citing *Borkowski*). To the same effect is *Roy Export Co. v. Columbia Broadcast-*

*ing System, Inc.,* 672 F.2d 1095, 1106 (2d Cir.), *cert. denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982). *See also Rush v. Oppenheimer & Co.,* 596 F.Supp. 1529, 1531 (S.D.N.Y.1984) ("The weight of authority indicates that punitive damages in fraud actions are not conditioned on an allegation that the fraud was perpetrated on the public."). *But see Durham Industries, Inc. v. North River Insurance Co.,* 673 F.2d 37, 41 (2d Cir), *cert. denied,* 459 U.S. 827, 103 S.Ct. 61, 74 L.Ed.2d 64 (1982) ("punitive damages may not be awarded in breach of contract cases, which involve a private wrong and where no public rights are involved."). In this action, the plaintiff alleges that the defendant made intentional misrepresentations pursuant to a fraudulent scheme. These allegations suffice to defeat Alko's motion to strike the demand for punitive damages from the amended complaint. That punitive damages are often demanded but rarely recovered is a practical consideration not part of a motion to dismiss.

2. Attorney's Fees

■ Attorney's fees are not generally available in an action brought under Rule 10b-5. *Straub v. Vaisman & Co., Inc.,* 540 F.2d 591, 599 (3d Cir.1976); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 211 n. 30, 96 S.Ct. 1375, 1389 n. 30, 47 L.Ed.2d 668 (1976). Nor are they recoverable in New York in an action for common law fraud. 24 N.Y.Jur. Fraud & Deceit § 257 (1962). The demand for attorney's fees in the amended complaint is, therefore, stricken.[16]

---

**16.** Under the so-called American rule, counsel fees may be awarded if the action has been commenced, maintained, or defended "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Browing Debenture Holders' Committee v. DASA Corp.,* 560 F.2d 1078, 1087-88 (2d Cir.1977). Rule 11 of the Federal Rules of Civil Procedure also permits an award of attorney's fees. Rule 11 provides that an attorney's signature on a pleading "constitutes a certificate by him" that the "pleading is well grounded in fact and warranted by existing law." Fed.R.Civ.P. 11. If a pleading is signed in violation of the rule, the court must impose sanctions including attorneys' fees. *Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 254 n. 7 (2d

D. The Martin Act Claims

According to the plaintiff, it has stated claims under two sections of New York's "Martin Act," sections 352-c and 339-a of the New York General Business Law.[17] Section 352-c provides in pertinent part:

It shall be illegal and prohibited for any ... corporation ... or any agent or employee thereof, to use or employ any of the following acts or practices:

(a) Any fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale;

(b) Any promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances;

(c) Any representation or statement which is false, where the person who made such representation or statement: (i) knew the truth; or (ii) with reasonable effort could have known the truth; ... where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of any securities ... regardless of whether issuance distributionm, exchange, sale, negotiation or purchase resulted.

N.Y.Gen.Bus.Law § 352-c (McKinney 1984). Section 339-a provides in relevant part, that

Any person, who, with intent to deceive, makes ... or causes to be made, ... any statement ... as to the value or as to facts affecting the value of the stocks ... of a corporation ... and who knows, or has reasonable ground to believe that

---

Cir.1985). "[W]here it is patently clear that a claim has absolutely no chance of success under the existing precedents, and where no reasonable argument can be advanced to extend, modify or reverse the law as it stands, Rule 11 has been violated." *Id.* at 254.

By striking the demand for attorney's fees, we do not preclude the plaintiff from taking full advantage of Rule 11 or the American Rule. There is, however, nothing to suggest that a fee award is appropriate at this time.

**17.** For purposes of this motion, we assume that the Martin Act applies, *see supra* n. 1.

any material representation, ... made in such statement ... is false, is guilty of a misdemeanor.

N.Y.Gen.Bus.Law § 339–a (McKinney 1968). A private right of action is implied under the Martin Act. *In re Investors Funding Corp.*, 523 F.Supp. 533, 544–545 (S.D.N.Y.1980) (§ 352–a); *Barnes v. Peat, Marwick, Mitchell & Co.*, 69 Misc.2d 1068, 332 N.Y.S.2d 281 (Sup.Ct.N.Y.Co.1972), *modified on other grounds*, 42 A.D.2d 15, 344 N.Y.S.2d 645 (1st Dep't 1973) (same).

The defendant claims that two cases decided in this district, *Kaufman v. Chase Manhattan Bank, N.A.*, 581 F.Supp. 350, 354–55 (S.D.N.Y.1984), and *Schenck v. Bear, Stearns & Co.*, 484 F.Supp. 937, 946 (S.D.N.Y.1979), and one state court case, *Herdegen v. Paine, Webber, Jackson & Curtis*, 31 Misc.2d 104, 220 N.Y.S.2d 459, 460 (Sup.Ct.N.Y.Co.1961), limit the availability of a private cause of action under the Martin Act to those from whom a plaintiff purchased or to whom it sold securities. Since the defendant is neither, it moves to dismiss both Martin Act claims.

In *Herdegen*, the court declined to imply a cause of action under the Martin Act against a broker who made misrepresentations about a security which the plaintiff then purchased from another broker. The *Herdegen* court stated,

> The intention of this statute is to protect the general public against fraud in the sale of securities. To extend the statute so as to apply to the facts in this case would be going beyond the intention of the statute. The statute cannot be reasonably extended to cover a purchaser who does not make his purchase from the misrepresenter, but makes such purchases from another broker. To place the responsibility for the possible purchase of unlimited number of shares from an unlimited number of brokers on the defendants is unreasonable and unrealistic.

*Id.*, 220 N.Y.S.2d at 460. In our view, this blanket statement, in some respects, goes too far. Not surprisingly, the court in *Schenck v. Bear, Stearns & Co.* sought to

limit its reach. The plaintiff in that case alleged that a broker from whom it had purchased securities on margin had misrepresented the nature of a possible margin call. When the plaintiff forfeited his securities after a margin call, he asserted a Martin Act claim against both his broker and his clearing broker. In declining to find either liable under section 352–c, the court stated, "In the case at hand, plaintiff did not purchase or sell securities from defendants as a result of the alleged representations, nor were the alleged representations designed to induce or promote such a purchase or sale. Accordingly, plaintiff cannot maintain a claim under Section 352–c." *Schenck*, *supra*, 484 F.Supp. at 946. This language from *Schenck* does not foreclose the imposition of liability on a defendant like Alko, who has allegedly made misrepresentations to a plaintiff in order to induce a purchase or sale from which the defendant will itself benefit. To impose liability under the Martin Act in these circumstances is not, in the words of *Herdegen*, "unreasonable or unrealistic."

This result may not square with *Kaufman v. Chase Manhattan Bank, supra*. In *Kaufman*, the court held that a plaintiff who invested in a company that subsequently went bankrupt could not state a claim against a bank that had fraudulently represented its intention to release certain liens in the bankrupt's property. To the extent that *Kaufman* would deny recovery to the plaintiff herein under the Martin Act, we respectfully disagree with its holding. The defendant's motion to dismiss the Martin Act claims is denied.

### III. Conclusion

Alko's motion to strike the claim for attorney's fees in the amended complaint is granted. In all other respects, its motions to dismiss the amended complaint are denied.

SO ORDERED.