Lanny A. HORWITZ, et al., Plaintiffs,

v.

AGS COLUMBIA ASSOCIATES, et al., Defendants.

No. 86 Civ. 5561 (WCC).

United States District Court,
S.D. New York.

Nov. 14, 1988.
As Amended Jan. 18, 1989.

puting defendants' characterization of the facts, I doubt that they seriously contend that "there is no genuine issue as to any material fact and that [plaintiffs are] entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).[1] Therefore, what follows is a discussion of defendants' motion for summary judgment, which is denied.

Raichle, Banning, Weiss & Stephens, Buffalo, N.Y., for plaintiffs; Arnold Weiss, of counsel.

Alter & Alter, New York City, for defendants; Stanley Alter, of counsel.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

This action was brought by individual limited partners and the limited partnership formed to acquire and manage a garden apartment complex in Columbia, South Carolina (the "Apartments"). They allege that defendants, the original owners of the Apartments, made various misrepresentations during the sale. Their claims arise under the securities laws of 1933 (the "1933 Act") and 1934 (the "1934 Act") (collectively, the "Securities Laws") and the Racketeer Influenced and Corrupt Organizations Act ("RICO").

Defendants moved for summary judgment pursuant to Rule 56, Fed.R.Civ.P. Plaintiffs opposed, and cross-moved for summary judgment in their favor. Since plaintiffs oppose defendants' motion by dis-

## BACKGROUND

In 1978, AGS Columbia Associates ("Columbia") purchased a garden apartment project located in Columbia, South Carolina (the "Apartments"). Berkeley Square Realty Associates, Inc. ("Berkeley Square"), an affiliate of plaintiff Berkeley Columbia Associates ("Berkeley"), made Columbia an offer to acquire the Apartments in 1982. The parties reached a preliminary agreement which was memorialized in a letter of intent on June 28, 1982. Under that agreement, Berkeley Square was given "the right, subject to the First Mortgagee's approval, to simultaneously resell the property to a partnership (general or limited) in which an affiliate of Berkeley Square Realty Associates, Inc. is a general partner." Defendants' Exhibit A at 3.

A purchase agreement was finally executed on April 28, 1983 (the "Agreement"). The Agreement indicated that the Prudential Insurance Company of America ("Prudential"), which held a first mortgage on the Apartments, would have to consent to the transaction. Columbia was liable for up to $2,500 for the cost of obtaining Prudential's consent.[2] Prudential eventually consented for a fee of $250,000.

---

1. Plaintiffs cross-move for summary judgment on two alternative grounds. They claim that either (1) there was a "mutual mistake" with respect to a condition in the contract justifying recision; or (2) defendants fraudulently misrepresented the extent of the plumbing problem in the apartment complex which they sold. *See* Plaintiffs' Response to Defendants' 3(g) Statement at 37. Cases involving fraud or mistake of fact necessarily turn on the parties' intent and generally cannot be disposed of without a trial. *See, e.g., Wechsler v. Steinberg,* 733 F.2d 1054, 1058 (2d Cir.1984) ("Issues of motive and intent are usually inappropriate for disposition on summary judgment.") (securities fraud); *Centronics Financial Corp. v. El Conquistador Hotel Corp.,* 573 F.2d 779, 782 (2d Cir.1978) (summary judgment inappropriate where party claimed

that contract was fraudulently induced). In any case, defendants vigorously oppose the factual characterizations that plaintiffs use to support these claims. These factual disputes preclude a grant of summary judgment in plaintiffs' favor.

2. The provision in the Agreement reads as follows:

This sale, and Seller's and Purchaser's obligations hereunder, are conditioned upon.... Receipt within 20 days of the date hereof by Seller from the holder of the First Mortgages of consent to the sale of the Property to Purchaser (and the encumbrancing as provided herein) on the terms and conditions set forth in this Agreement, without requirement that any change be made in the terms of the First

The Agreement also contained a disclaimer of warranties which referred to a "problem" with the pipes in the Apartments:

Purchaser acknowledges that it has inspected the Property is acquainted with the problem relating to pipes, and is otherwise acquainted with its condition (including but not limited to, problems relating to pipes which have been breaking periodically) and shall take title "as is" in its present condition and subject to reasonable use, wear, tear and natural deterioration between the date hereof and the Closing Date.... Seller has made no representations or warranties as to the condition of the Property or any financial or other information relating thereto, except as explicitly set forth herein.

Defendants' Exhibit B at 31–32.

At about the same time, Berkeley prepared and distributed a private placement memorandum (the "Memorandum"). The Memorandum offered up to 35 limited partnership units for $86,000 each. The offering was conditioned upon the sale of the Apartments to Berkeley.

On June 28, 1983, Berkeley acquired title to the Apartments in accordance with the Agreement. Berkeley executed a purchase money wrap-around second mortgage in favor of Columbia in the face amount of $6,250,000, and paid its obligations under the mortgage from June 1983 through April 1986. By January 1986, however, Berkeley reported that "the financial condition of the Berkeley Square Apartments has continued to deteriorate." Defendants' Exhibit C at 1. It notified Columbia that the project had experienced a number of difficulties. One of the problems it mentioned was that earlier that year "a significant cold spell caused a substantial amount of plumbing pipes to burst in the apartments with concomitant flooding conditions." Defendant's Exhibit C at 1–2. Berkeley requested mortgage deferrals totaling $315,000.

The parties' attempt to reach an agreement concerning the mortgage payments failed, and in June 1986 Berkeley indicated that it would not pay its May and June 1986 mortgage installments or the required debt service. The mortgage was accelerated on June 24, 1986.

Berkeley commenced an action on July 9, 1986 in the State of South Carolina alleging that Columbia misrepresented the extent of the plumbing problem and that it was entitled to rescission and damages under state law. The next day, Columbia filed an action against Berkeley to foreclose on its mortgage. Berkeley's answer to the foreclosure complaint interposed a counterclaim which incorporated by reference the claims of Berkeley's own suit. Berkeley then transferred the Apartments to DFB Corporation ("DFB"), a corporation owned by plaintiff Lanny A. Horowitz ("Horowitz"), which filed a Chapter 11 bankruptcy petition in the Southern District of New York. The bankruptcy case was transferred to Southern District of South Carolina, and the Bankruptcy Judge there lifted the automatic stay of the state foreclosure action. The South Carolina state court then held that Berkeley "failed to establish any of the elements of fraud," and ordered a foreclosure and sale on December 29, 1987. *AGS Columbia Associates v. Berkeley Columbia Associates*, No. 87–CP–40–2123, slip. op. at 3 & 9 (C.P. Richland County, S.C. Dec. 29, 1987).[3]

Mortgages, or payment of a fee of more than $2,500, and a waiver of any right to declare any First Mortgage in default or to accelerate the principal as a result thereof. Purchaser agrees to cooperate with Seller and promptly provide to Seller such financial and other information, including references, as the holder of the First Mortgages may require. Seller shall use best efforts to obtain such consents within such period, but except for the $2,500 expense which Seller has agreed to accept, neither Purchaser nor Seller shall be required to incur any expense or take any action (other than reasonable telephone and written communication) with respect thereto. Defendants' Exhibit B at 5–6.

3. Defendants filed this motion before the South Carolina decision was handed down but have since contended that this Court is bound by that decision. In opposing defendants' motion, plaintiffs have contended that this Court is not limited by the South Carolina judgment. For the purpose of deciding this motion I have assumed, without deciding, that I am not bound by the South Carolina decision. Defendant may file another motion for summary judgment on

This action was commenced on July 17, 1986. Relief is sought under the Securities Laws and RICO. On this motion, defendants contend that (1) the Securities Laws are inapplicable; and (2) there was no fraud, and therefore no violation of RICO.[4]

## DISCUSSION

A party seeking summary judgment must demonstrate that "there is no genuine issue as to any material fact." Fed.R. Civ.P. 56(c); *Knight v. U.S. Fire Insurance Company*, 804 F.2d 9, 11 (2d Cir. 1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). It must demonstrate that there is a "genuine issue for trial." *Id.* at 587, 106 S.Ct. at 1356. "In considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight*

804 F.2d at 11. The inquiry under a motion for summary judgment is thus the same as that under a motion for a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986).

### A. The Applicability of the Securities Laws

The complaint alleges that "[t]he limited partnership units were and are 'securities' within the meaning of the 1933 Act and the 1934 Act, and the transaction amounted to an offering of securities by AGS [Columbia], with Berkeley functioning in a role analogous to that of an underwriter in a stock offering." Complaint ¶ 10. Defendants claim that Columbia sold land, not "securities," and that it was neither a "seller," "issuer," nor "underwriter" within the meaning of the Securities Laws. Defendants' Memorandum of Law at 5–7.

#### 1. *Presence of a "Security"*

The definitions of "security" in the 1933 Act[5] and 1934 Act[6] are "essentially

---

the ground that the Court is bound by the state decision.

4. Defendants also seek to dismiss the class action aspects of the complaint. This motion is not opposed, *see* Plaintiffs' 3(g) Statement in Support of its Cross–Motion ¶ 12, and is thereby granted.

5. The 1933 Act defines a security as:
   [A]ny note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, pre-organization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option or privilege on any security, certificate of deposit or group of index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, or option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certifi-

cate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.
   15 U.S.C. § 77b(1).

6. The 1934 Act defines "security" as:
   [A]ny note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value hereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at

the same." *Marine Bank v. Weaver*, 455 U.S. 551, 555 n. 3, 102 S.Ct. 1220, 1223 n. 3, 71 L.Ed.2d 409 (1982) (citing *United Housing Foundation Inc. v. Forman*, 421 U.S. 837, 847 n. 12, 95 S.Ct. 2051, 2058 n. 12, 44 L.Ed.2d 621 (1975)); *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 545 F.Supp. 1314, 1346 (S.D.N.Y.1982) (Stewart, J.). Both statutes list overlapping categories of interests that will be considered securities. *See Tcherepnin v. Knight*, 389 U.S. 332, 339, 88 S.Ct. 548, 554, 19 L.Ed.2d 564 (1967). While it is well-settled that an interest labeled "stock" that bears all the characteristics of stock is a "security" under the Securities Laws, *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 690–91, 105 S.Ct. 2297, 2304, 85 L.Ed.2d 692 (1985), in the more difficult cases, "form should be discarded for substance and the emphasis should be on economic reality." *Tcherepnin*, 389 U.S. at 336, 88 S.Ct. at 553.

Most of the categories listed in the definitions of "security" concern the limited class of "commonly known documents traded for speculation or investment." *S.E.C. v. W.J. Howey Company*, 328 U.S. 293, 297, 66 S.Ct. 1100, 1102, 90 L.Ed. 1244 (1946). It is the "catch-all" term, "investment contract," that protects the more unconventional investments from market abuses. *See* 1 L. Loss, *Securities Regulation* 483 (2d ed. 1961); *see also Tcherepnin*, 389 U.S. at 338, 88 S.Ct. at 554 ("Even a casual reading of [the statute] reveals that Congress did not intend to adopt a narrow or restrictive concept of security in defining that term."); *S.E.C. v. C.M. Joiner Corp.*, 320 U.S. 344, 351, 64 S.Ct. 120, 123, 88 L.Ed. 88 (1943) ("the reach of the Act does not stop with the obvious and commonplace"). Much of the litigation in this area, therefore, has focused on the meaning of "investment contracts."

The broad definition of "investment contract" was first enunciated in *S.E.C. v. W.J. Howey Company*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). The Court held that "an investment contract for

the time of issuance or not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise." *Id.* at 298–99, 66 S.Ct. at 1102–03. It was felt that this broad definition satisfied Congress' intent to embrace "the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id.* at 299, 66 S.Ct. at 1103.

The Court has held that the "*Howey* test," *Landreth Timber Co.*, 471 U.S. at 689, 105 S.Ct. at 2303, is satisfied where units of a citrus grove development, coupled with a contract for cultivating, marketing and distributing the net proceeds, are offered to ordinary investors, *S.E.C. v. W.J. Howey Company*, 328 U.S. 293, 299–300, 66 S.Ct. 1100, 1103–04, 90 L.Ed. 1244 (1946), or where a state chartered savings and loan association offers withdrawable capital shares, *Tcherepnin v. Knight*, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed. 2d 564 (1967). The test is not met, the Court has declared, where employees participate in a compulsory pension plan, *International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 558–62, 99 S.Ct. 790, 795–98, 58 L.Ed.2d 808 (1979), or where shares are purchased for the purpose of acquiring low-cost housing in a cooperative subsidized project, rather than for the purpose of making a profit, *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852–53, 95 S.Ct. 2051, 2060–61, 44 L.Ed.2d 621 (1975).

Taken together, the *Howey* and *Forman* cases illustrate that, sometimes, what appears to be a real estate transaction is an offering of securities, and what seems like a sale of stock is in essence a real estate deal. The deeds purchased by the inves-

15 U.S.C. § 78c(a)(10).

tors in *Howey,* for example, were "investment contracts" because they were coupled with the seller's promise to cultivate and market oranges for the investors' profit. *Howey,* 328 U.S. at 299–300, 66 S.Ct. at 1103–04. In contrast, the "stock" paid for by the homeowners in *Forman* was merely evidence of "deposits" on apartments in the subsidized cooperative housing project. *Forman,* 421 U.S. at 852–53, 95 S.Ct. at 2060–61. An interest in real estate, therefore, is considered a "security" where ordinary investors pay, not only for the land, but for the promoter's promise that the real estate will be managed in a way that may yield profits that can be distributed to the investors.

Lower courts applying the *Howey* test to real estate transactions have reached the same conclusion. Simple land sales are outside the scope of the Securities Laws. *Woodward v. Terracor,* 574 F.2d 1023, 1025 (10th Cir.1978) (purchase of subdivision lots in residential community did not constitute "investment contract" where seller's only obligation was to deliver title). Indeed, as long as the investors retain full control over management of the property, their interest will not be deemed a security. *Perry v. Gammon,* 583 F.Supp. 1230, 1232–33 (N.D.Ga.1984) (limited partnership interests in real estate syndicate held not securities where investors retained control over management of apartment complexes); *Davis v. Rio Rancho Estates, Inc.,* 401 F.Supp. 1045 (S.D.N.Y.1975) (Brieant, J.) (where seller of residential lots, though not obligated to manage the residential complex, constructed roads and other improvements, investment in lot was not a security). Where, however, investors are merely limited partners in a venture that invests in and manages real property, their interests will be protected by the Securities Laws. *Koppel v. Wien,* 575 F.Supp. 960, 965–66 (S.D.N.Y.1983) (Duffy, J.) (participations in partnership that owned hotel were "securities," where investors expected to derive profits from the entrepreneurial or managerial efforts of the general partner). This distinction is clearly described in Professor Loss's comprehensive treatise:

> The line is drawn ... where neither the element of a common enterprise nor the element of reliance of the efforts of another is present. For example, no "investment contract" is involved when a person invests in real estate, with the hope perhaps of earning a profit as the result of a general increase in values concurrent with the development of the neighborhood, as long as he does not do so as part of an enterprise whereby it is expressly or impliedly understood that the property will be developed by others.

1 L. Loss, *Securities Regulation* 491–92 (2d ed. 1961).

Thus, although the real estate that Columbia sold to Berkeley was not itself a "security," the limited partnership units which Berkeley sold were "securities." The private placement of the limited partnership interests was advertised in a confidential memorandum sent to selected offerees. *See* Plaintiff's Exhibit 8. The Memorandum indicated Berkeley's intention to sell up to 35 limited partnership units for $86,000 each. *Id.* at iv. Offerees were warned that "[i]nvestment in the Units involves a high degree of risk and is suitable only for persons of financial means who have no need for liquidity in this investment." *Id.* at 1. The partnership sought experienced, and, in particular, accredited investors. *Id.* Columbia's role in the transaction was fully disclosed. Berkeley reserved the right to terminate the sale of the partnership interests in the event that Columbia failed to transfer ownership of the Apartments to Berkeley. *Id.* at 60. Under the terms of the transaction, the limited partners completely depended on the general partners' management efforts:

> The General Partners shall have the *exclusive authority to manage and control* the operations and affairs of the Partnership, provided, however, the General Partners shall not (without obtaining the prior written consent of 51% of the Limited Partnership Interests) sell, lease, assign, exchange or otherwise transfer or covey all or substantially all of the Partnership's property.

Plaintiff's Exhibit 15 at 4 (emphasis supplied).

It is clear that this transaction involved a sale of "securities." While the land sold to Berkeley could not be a security within the meaning of the Securities Laws, the limited partners evidently entered into "investment contracts" when they agreed to rely on Berkeley's skill and efforts in order to realize a return on their investment.

### 2. Columbia's Role in the Sale of Securities

Of course, that this case concerns a sale of securities would be of no consequence if defendant Columbia's role in the transaction was not actionable under the Securities Laws. The facts concerning Columbia's role are hotly disputed. But in considering Columbia's request for summary judgment on this issue, we view the facts in a light most favorable to plaintiffs. *Sulmeyer v. Seven–Up Co.*, 411 F.Supp. 635, 640 (S.D. N.Y.1976) (Stewart, J.).

Based on the evidence proffered by Berkeley, a jury could infer that Columbia embarked with Berkeley in a joint venture to syndicate the Apartments. Not surprisingly, Columbia was concerned about Berkeley's source of financing for the purchase of the Apartments. Columbia was informed that the purchase price would be raised through a real estate syndication. Horowitz Affidavit ¶ 38. Columbia's representative, Albert G. Schmerge, III ("Schmerge"), assured Horowitz that he had headed many syndications and was familiar with their workings. Horowitz Affidavit ¶ 26.

Schmerge furnished Berkeley with information concerning Columbia and the Apartments for use in the Memorandum which was sent to the investors. Horowitz Affidavit ¶ 32. The final draft of the Memorandum contained audited financial information about Columbia. Plaintiffs' Exhibit 8. Schmerge was furnished with copies as well as summaries of the Memorandum. Horowitz Affidavit ¶¶ 36 & 37; Plaintiffs'

Exhibit 5 at 411; Plaintiffs' Exhibit 13. In April or May, 1983, prior to a meeting with Prudential, Schmerge and Horowitz worked on the Memorandum together at a hotel in Atlanta, Georgia. Horowitz Affidavit ¶¶ 41–44. Apparently, when Schmerge added a reference to the pipes in a final draft of the Agreement, "he affirmatively assured [Horowitz] that the Private Placement Memorandum could remain as it was, without any further disclosure about any water supply problem, and without any amending sticker or formal amendment, because it was 'nothing to be concerned about' and 'not serious.'" Horowitz Affidavit ¶ 35; *see also* Plaintiffs' Exhibit 12 at 121–25 & 140.

The sale of the Apartments and the private placement of the limited partnership interests closed simultaneously. Plaintiffs' Exhibit 12 at 141. The limited partners were represented at the closing, as was Schmerge. *Id.* at 140–41. Moreover, "Mr. Schmerge [was] aware of the fact that the closing was a contemporaneous closing of both the purchase of New South Square Apartments by Berkeley Columbia Associates as well as a closing of the private placement issue by Berkeley Columbia amongst the 35 limited partners." *Id.* at 141–42. Columbia received most of the proceeds generated by the private placement in exchange for the Apartments. *Id.* at 142–43. It also received a copy of the Memorandum, which was included in the list of closing documents. Plaintiffs' Exhibit 15 at 9.

The sections of the Securities Laws which plaintiffs allege defendants violated are 15 U.S.C. § 77q and 15 U.S.C. § 78j(b) and Rule 10b–5 thereunder. Section 77q of the 1933 Act concerns material false statements or omissions made by "any person *in the offer or sale* of any securities." 15 U.S.C. § 77q (emphasis supplied).[7] Section

---

**7.** Section 77q(a) of the 1933 Act provides as follows:

It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or

by the use of the mails, directly or indirectly—

(1) to employ any device, scheme or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact neces-

78j(b) of the 1934 Act relates to deceptive devices employed by any person *"in connection with the purchase or sale* of any security." 15 U.S.C. § 78j(b) (emphasis supplied).[8]

### a. The 1933 Act Allegations

█ The 1933 Act provision, by its terms, is restricted to violations by offerors or sellers of securities. *See* 15 U.S.C. § 77q ("any person in the offer or sale of any securities"); *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 545 F.Supp. 1314, 1353 (S.D.N.Y.1982) (Stewart, J.). The word "seller," however, has not been limited to its most common meaning. "The securities laws include as a seller entities which proximately cause the sale ... or whose conduct is 'a substantial factor in causing a purchaser to buy a security.'" *Id* (citation omitted). A jury may therefore reasonably conclude that defendants' activities brought them within the relatively narrow confines of section 77q.

Most of the cases discussing the "substantial factor" test have been brought under 15 U.S.C. § 77 *l*.[9] The language used in that section is similar to, if not narrower than the terms used in 77q. An analogy to the cases decided under that provision is therefore appropriate. *See Fund of Funds*, 545 F.Supp. at 1353.

> sary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (3) *to engage in any transaction, practice,* or course of business which operates or would operate as a fraud or deceit upon the purchaser.

**8.** Section 78j(b) of the 1934 Act provides:
> It shall be unlawful for any person, directly or indirectly, by use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
> ....
> (b) *To use or employ, in connection with* the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative device or deceptive device or contrivance in contravention of such rules and regulations as the COmmission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**9.** 15 U.S.C. 77 *l*(2) provides:

This Court has explicitly rejected a strict privity requirement in section 77 *l* cases:
> [S]trict privity with the buyer is not a prerequisite to liability under [section 77*l* ].... What is required is that a [section 77*l* ] plaintiff plead and prove that the defendant in question proximately caused the sale and injury, ... or "substantially participated" in the transaction.

*In re Gas Reclamation, Inc. Securities Litigation*, 659 F.Supp. 493, 508–09 (S.D.N. Y.1987) (Sand, J.).

In *Gas Reclamation*, purchasers of investment units in a natural gas venture alleged that they were damaged by misrepresentations made in the private placement memorandum. The court dismissed the plaintiffs' claim against an accounting firm because the private placement memorandum was written before the firm was engaged. *Id.* at 505. It explained:
> [T]he complaint fails to allege any significant affirmative acts or representations by Peat Marwick made concurrently with the sale of Units to Investors, or the existence of any misleading documents attributable to Peat Marwick that could serve as the predicate for concluding that Peat Marwick was the proximate cause or substantially participated or assisted in the sale.

> Any person who—
> (2) offers or sells a security (whether or not exempt ...), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

*Id.* at 509. On the other hand, the plaintiffs' claim against two lenders was upheld because of the role they played in the preparation of the private placement memorandum:

> Investors' complaint adequately sets forth allegations of meaningful participation and conspiracy by these defendants for purposes of a motion to dismiss. Although the complaint does not allege that defendant banks were in actual contact with plaintiffs at the time of sale, it does allege that the banks reviewed and approved the first private placement manual containing numerous misrepresentations, continued to finance [the venture] after learning that certain investors had defaulted based on claims of fraud, and purchased and sold Investors' notes at a discount. It alleges that Northwestern, *inter alia,* assisted in the preparation of marketing materials for [the venture] and bonded the promissory notes provided by investors.

*Id.* at 509.[10]

I am persuaded that the evidence proffered by plaintiffs is sufficient to withstand a motion for summary judgment on its 1933 Act claim. A reasonable jury could conclude that Columbia reviewed and approved the Memorandum, waited until the eve of the closing to inform Berkeley about the problem with the pipes, and then assured Berkeley that there was no need to amend the Memorandum. The jury could infer that this activity induced the limited partners' decision to invest, and benefited Columbia. The proximate cause test would undoubtedly be satisfied by such a scenario.

### b. The 1934 Act Allegations

While section 77q is limited to the activities of sellers, a defendant need not be a purchaser or seller of securities to come within the terms of 15 U.S.C. § 78j(b) or Rule 10b–5[11]. "[P]rivity between plaintiffs and defendants is not a requisite element of a Rule 10b–5 cause of action for damages.... [Relief may be granted] where there have been no direct transactions between plaintiffs and defendants." *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith Inc.,* 495 F.2d 228, 239 (2d Cir. 1974); *Baretge v. Barnett,* 553 F.2d 290, 291 (2d Cir.1977) (view that privity is required in 10b–5 cases is now discredited).

The broad reach of Rule 10b–5 is illustrated by the case of *Whitbread v. Rothschild,* 630 F.Supp. 972 [1985–86 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 92,539 (S.D.N.Y.1986) (Goettel, J.). The defendants in *Whitbread* were wine and alcohol producers who had agreed to supply such products to Buckingham Corporation, a wine and alcohol distributer owned by Beatrice Companies, Inc. The distribution contracts could be terminated by the suppliers in the event that Buckingham Corporation underwent a change of control. Having decided that it would be to their advantage to terminate the contracts, the defendants misled the plaintiff, a corporation which

---

**10.** The Court of Appeals for the Second Circuit has approved the broad definition of "seller" employed in *Gas Reclamation,* but has noted that, as the defendant's connection with the sale becomes more attenuated, a stricter culpability standard may be applied. *Akerman v. Oryx Communications, Inc.,* 810 F.2d 336, 344 (2d Cir.1987) (section 77l requires either privity or scienter). Even if scienter is required, however, defendants' motion would be denied since plaintiffs' evidence would support an inference of defendants' intent to deceive. *See, Wechsler v. Steinberg,* 733 F.2d 1054, 1058 (2d Cir.1984) (defendants will not be granted summary judgment "on the ground of lack of scienter unless the plaintiff has failed to present facts that can support an inference of bad faith or an inference that defendants acted with an intent to deceive").

**11.** Rule 10b–5 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading,
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
>
> 17 C.F.R. § 240.10b–5.

had expressed interest in acquiring Buckingham Corporation, into believing that the defendants might renew the supply contracts despite the change in control. After the plaintiff purchased all of Buckingham Corporation's outstanding shares, the defendants terminated the contracts.

The court held that a proper 10b–5 claim was alleged. It noted that Rule 10b–5's "in connection with" requirement is satisfied where a plaintiff demonstrates "both *loss causation*—that the misrepresentations or omissions caused the economic harm—and *transaction causation*—that the violations in question caused the [plaintiff] to engage in the transaction in question." *Id.; see also Bennett v. United States Trust Co.*, 770 F.2d 308, 313 (2d Cir.1985), *cert. denied*, 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed. 2d 776 (1986); *Schlick v. Penn–Dixie Cement Corporation*, 507 F.2d 374, 380 (2d Cir.1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975). It construed the duty to avoid misleading omissions under 10b–5 very broadly:

> When one party undertakes to communicate information to another who it knows will use that information in connection with a securities purchase, the former assumes a duty "to communicate any additional or qualifying information then known, the absence of which would render misleading that which was communicated."

*Id* (citation omitted); *see also First Virginia Bankshares v. Benson*, 559 F.2d 1307 (5th Cir.1977), *cert. denied*, 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978).

Plaintiffs' allegations are sufficient to bring defendants within Rule 10b–5. They charge that defendants misrepresented the extent of the plumbing problem knowing that their statements would be communicated to potential limited partners. Horowitz Affidavit ¶ 35; *see also* Plaintiffs' Exhibit 12 at 121–25 & 140. These investors would not have purchased the limited partnership interests had defendants fully disclosed the extent of the problem. Horowitz Affidavit ¶¶ 19 & 22. A jury may conclude that the limited partners were damaged and that their injury was the foreseeable result of defendants' conduct. If plaintiffs' evidence is believed, the fact finder may conclude that Columbia's involvement in the securities transaction was substantial. Any misrepresentations made by it would therefore be actionable. In sum, by injecting itself into the securities sale, Columbia acted "in furtherance of its own interests and must suffer the consequences of its actions." *Whitbread.*

### B. The Fraud Claims

█ Plaintiffs allege that defendants engaged in a pattern of mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343, in violation of RICO. Specifically, they claim that (1) Columbia failed to disclose fully the extent of the plumbing problem; (2) Columbia did not inform plaintiffs that the property was subject to severe flooding; and (3) Columbia falsely stated that it believed Prudential's consent could be obtained for $2,500, though it knew a much higher fee would be demanded.

Columbia argues that Berkeley was aware of the plumbing problem. It proffers evidence that Berkeley inspected the property and discovered that the project may "have frozen pipes to contend with as a chronic situation." Defendants' Exhibit M; Defendants' Memorandum of Law at 8. It also relies on a provision in the contract in which Berkeley acknowledged "that it has inspected the Property is acquainted with the problem relating to pipes, and is otherwise acquainted with its condition (including but not limited to, problems relating to pipes which have been breaking periodically) and shall take title 'as is' in its present condition." Defendants' Exhibit B at 31–32.

Plaintiffs respond that while they knew that the pipes broke periodically, they were not aware of the full extent of the problem. They contend that the nature of the plumbing problem could not be determined by inspection. *See* Plaintiffs' Exhibit 20. Under their interpretation of the documents, plaintiffs were misled by Schmerge's "half-truths" concerning a "minor" problem with the pipes. Plaintiffs were not aware that the plumbing problem could not be solved.

They "concluded that 'every Project has its problems,' and that the Berkeley Square Apartments problem was limited to 'some' pipes leaking occasionally—probably due to freezing when heat is turned off in vacant apartments—which was correctable by the relatively inexpensive solution of keeping some heat in vacant apartments in the winter." Horowitz Affidavit ¶ 16.

Whether either party knew the full extent of the plumbing problem at the time the contract was entered into is a question of fact. *See* 6 J. Moore & J. Wicker, *Moore's Federal Practice* ¶ 56.17[41.2] (2d ed. 1988) ("Summary judgment is generally inappropriate when issues of motive, intent, and other subjective feelings and reactions are material."); *Friedman v. Meyers*, 482 F.2d 435, 439 (2d Cir.1973). Moreover, the contract's reference to "problems relating to pipes which have been breaking periodically" is ambiguous under the circumstances, since it does not indicate whether the problem is serious or whether it could be economically repaired. This legitimate factual dispute concerning the contract's terms precludes summary judgment on this question. *Wards Company, Inc. v. Stamford Ridgeway Associates*, 761 F.2d 117, 120 (2d Cir.1985); *Ralli v. Tavern on the Green*, 566 F.Supp. 329, 331 (S.D.N.Y.1983) (Lasker, J.).

In response to plaintiffs' second claim of fraud, defendants argue that the Apartments were not subject to severe flooding during their ownership of the project. Schmerge Affidavit at 12. The evidence proffered by plaintiffs, however, precludes this Court from ruling that there was no fraud as a matter of law. *See* Horowitz Affidavit ¶ 9H; Plaintiffs' Exhibit 3 at 1–2 (inter-office memorandum indicating prior management's concern about flooding problem).

In their third claim for fraud, plaintiffs allege that during negotiations, Columbia assured Berkeley that Prudential would consent to the transaction for around $2,500, even though Columbia knew that Prudential would demand much more. The complaint alleges that "[b]y the time that Horowitz learned that the consent fee would be $250,000 rather than $5,000, the purchase and syndication of New South Square had reached the point where failure to consummate the transaction would have caused Berkeley to incur substantial costs and liabilities." Complaint ¶ 21.

Defendants argue that under the Agreement, Berkeley could have walked away from the transaction when Prudential demanded more than $2,500, since the transaction was "conditioned upon.... [r]eceipt ... of [Prudential's] consent to the sale ... without ... payment of a fee of more than $2,500." Defendants' Exhibit B at 5–6. Defendants' interpretation of the contract is corroborated by Horowitz's deposition testimony:

Q.  As you said before, you had a chance to walk off the deal notwithstanding the fact that it had a major impact on you, did you not?

MR. SMITH: Objection to the form.

A.  I could have exercised my right under the contract.

Defendants' Exhibit S.

Plaintiffs now claim, however, that they believed themselves bound by the Agreement despite Prudential's demand for more than $2,500. Plaintiffs' Response to Defendants' 3(g) Statement at 36–37. While no reasonable jury would conclude that Berkeley thought the Agreement was still binding, plaintiffs' third fraud claim cannot be dismissed at this time. The jury may still conclude that Berkeley was deceived and thereby induced to proceed with the transaction. It may believe, for example, that Columbia knew Prudential would demand more than $2,500, assured Berkeley that Prudential would only ask for $2,500, and by doing so, induced Berkeley to complete the deal to cover the expenses already incurred in reliance on Columbia's misrepresentation. Only the trier of the facts can decide whether an inference of fraud is warranted here.

### C.  Plaintiffs' Request to Amend the Complaint

In their motion papers, plaintiffs request leave to file an amended complaint substituting Aries Realty, Inc., the current owner

of the Apartments, as plaintiff and clarifying their fraud claims. Plaintiffs never requested a pre-motion conference to discuss such an amendment, and defendants never had an opportunity to oppose the motion. A decision on plaintiffs' request will be rendered after a conference is held.

## CONCLUSION

For the reasons stated above, the cross-motions for summary judgment are denied. Plaintiffs' request to amend the complaint is stayed pending a conference before the Court.